Thank you. If it pleases the court, my name is Richard Cornell. I represent the appellant Rick Young. I have to say, starting off, this is one of the most difficult appeals I've encountered in my career. One reason is just trying to wrap my mind around the forex exchange market and how apparently horribly unregulated it was in 06 through 08. But from an appellate practitioner's perspective, I had two problems. One was issue selection. I know from where you sit that when you see an appeal with eight trial issues and five sentencing issues, it looks like appellate counsel is trying to throw a lot of stuff against the wall, hoping something sticks. But I do want to advise the court that originally I tried to file a 24,000-word brief. I was told, no, knock it down to 19,000, which I did. And to do that, I knocked out three issues. I really tried to confine this to issues which, in my mind, are error and aren't merely interesting but error. The second problem I had was issue emphasis. I put the constructive amendment issue first, and I believe in that issue. But I put it first because it's the homerun issue, because if you have a constructive amendment to an indictment, it's structural error. It can't be harmless. But to me, as I look at this case, the heart of it is just how unfair a trial, in my opinion, Mr. Young got. And I, therefore, want to confine my comments today to those issues, to the trial issues. Now, first off, on the civil judgment issue, the trial judge allowed in the fact of a favorable civil judgment to Mr. Meckling. He thought he'd limited the prejudice by saying, we won't say how much it was. But Meckling is allowed to testify that he hasn't collected a dime of it. There's no limiting instruction when Mr. Young filed a motion in limine prior to trial and asked for one if this was coming in. And it came in in the case in chief. So from the jury's perspective, what's this relevant to at that point? Today, the government says it's relevant to good faith. Well, the defense hadn't testified at that point. As far as the jury knew, this was being introduced for a conclusive effect. One jury or tribune has already found Meckling in favor of Meckling against Young. Why shouldn't we do the same thing? Today, the government says it's relevant to good faith, but that overlooks a key fact. Mr. Young was indicted in December of 2008. This judgment happened in February of 2010. At the time this judgment happens, what is Mr. Young supposed to do? The government had tied up Global One's money by that time, and there was a motion to release it in March of 2009, which was denied. So I can't see how this is relevant to good faith. And with the lack of a limiting instruction, it certainly was. But was there any argument based on this? I'm sorry? Was there any argument based on this? There was a motion in limine to say, keep it out. I don't recall seeing that. Okay. That's why I think this case may be properly reviewed from a cumulative error position. But, yeah, I will concede that much. I don't want to misquote the record, of course.        Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. The question is, how can this one little piece of evidence, even assuming there was any error, be harmful? Because, as I say, our position is when a jury hears this without any context, they naturally assume, wow, a jury already heard this case. But it didn't even say that much. It didn't even say a jury already heard this case. It said it'd write a case, I got a judgment, and he didn't pay it. That's true. As it turns out, it was a jury, but no. The fact that a jury verdict came out, that didn't come out to this criminal jury. I agree with that. But they knew that he had sued and won. And, as I say, I think this started... If you want a little clue about what I'd like to hear about, I'd like to hear about the sending to the, not sending the question of whether it was secured to the jury and whether that was harmless or not harmless. Okay. Thank you. In other words, the mandatory presumption issue, the jury instruction. First, though, and I am going to talk about that, and I will right now, but first, I want the Court to appreciate the irony involved in this. Before this jury instruction happens, we have the out-of-court hearsay opinion of the State court judge in February of 2008 that this looks like securities, and I advise you, Mr. Young, to stop. Introduced over objection. Which couldn't have had a whole lot of prejudicial effect because the issue didn't go to the jury. So that's why I'd like to hear about it. Well, here's the point. The irony is that in the prior issue, they thought they had limited the sting of that by saying that this is relevant to information that may have been provided to Mr. Young regardless of its accuracy. Well, then the trial judge gives a jury instruction that says basically that State court judge was spot on. These are securities as a matter of law. And to me, that's a blatant violation of Gowden and Sandstrom to take that issue away. The United States versus Johnson case that the government referenced in its brief is right on point, even though it precedes Gowden by 12 years. But, moreover, that instruction runs contrary to Reeves v. Ernst and Young, and we did tender a Reeves v. Ernst and Young instruction, which the trial court would not give. And what that instruction did is it basically forced the jury to discount, basically ignore the testimony of Sharon McNair, the CPA who was trying to pay on these per schedule, Bill Willard, undercover agent Waze Lenko, and the other members who actually honestly thought that these notes were what they said, notes. I am not arguing that these notes were notes as a matter of law. Certainly not. Well, notes can be securities, so I don't see the connection exactly. Notes can be securities. They can also be notes. Of course. Yes. What I'm saying is it's purely a jury question, provided the jury is properly instructed and further provided that the jury has. If the security is defined as notes, I mean, isn't the fact that it's a note or isn't a note isn't the difference? So what is the difference? I'm sorry, I didn't understand. The fact that it's a note or isn't a note is not the difference. In fact, note is one of the definitions of security. So what is the difference? A bond is basically a note, and it's a security. Based on Reeves v. Young, what was the purpose of the money? Was it offered to the general public or to a select group of people? What were the expectations of the people who put the money in? I mean, those factors are what determine whether it's a note or whether it's a security. And there is conflicting testimony in the record on these points. A generally available bond is a security, right? It can be. Okay. As I said, this is purely a fact question, but first and foremost, the jury has to be accurately instructed, and you can't take that question away from the jury. To me, it's a blatant Gowden and Sandstrom violation. Right. But there's a harmless error theory applicable, and I want to know. I would submit to you that a jury would have had a way to go on this instruction to say, no, these people thought these notes were notes. They were offered only to the members. They originally were offered for the purposes of buying particular assets or particular projects, such as buying the trend brokerage, most importantly buying the aggregating software. But weren't they set up so that they never expired? In other words, they were never paid off? The notes on their face are confusing, quite frankly, particularly in the initial Phase I offering. And I will concede that based on the confusing language, a properly instructed jury could have said, oh, you know, these are securities because they're profit sharing. But they weren't paid out of profits when they were paid. They were paid out of receipts. That sounds like a note. Like I say, a properly ---- They said they were going to be paid out of profits. I know it said that, but the reality is, per Ms. McNair, is they were paid out of receipts. They weren't paid out of profits. And obviously, they weren't paid in full, not even close. Now, but I want the Court to understand the interplay between that and the State court judge opinion, because essentially, first off, how can an out-of-court hearsay opinion, not a hearsay statement merely, but a hearsay opinion of a State court judge on a question of Federal law ever be admissible? But how could it have possibly mattered? Because the issue didn't go to the jury. So that's your problem, not what was said by some outside judge. Had it been limited to count 13, the securities fraud count, I would agree with that. It wasn't. Basically, it's put out there. It makes it look like my client's a scofflaw who's not willing to follow the direction of a judge. And it's not limited to count 13. It's introduced as evidence on everything, on all of the counts. To me, that is classic Rule 403 prejudice, and it bleeds over past count 13 to all of the counts for that reason. Let me talk about the money laundering issue as well. Now, when you look at ERV 137, which is the charge in the second superseding indictment, it says that my client wire-transferred $202,000 derived from fraud into Global One's payout account on May 23, 2007. It does not say, and from there the money went to May Lee, which was my client's personal account. And the government had the ability to charge it, because that's what they did charge in count 8. There they charged $131,000 transferred into the May Lee account on August 10, 2006 as money laundering under 1957. That charge, by the way, was dismissed at 29A time because the government intentionally did not present any proof on it. But now, to me, the fact that the jury is not instructed on profits when we're in the Santos era of money laundering and the Bush era of money laundering makes this error. But this money, as I understand it, just went into his pocket. That's the problem. It did ultimately in many respects, but here's factually what you need to understand. There's two phases of what happened in this case, 06 to pre-Hedquist and Conlin. There was a particular money laundering charge. It regarded certain transactions. And the certain transactions were essentially, as I understood it, that it went from an operating fund to a payment fund to his account or to his colleague's accounts. Or payout account to the members who needed to be paid out. Well, did it go to the members who needed to be paid out? The numbers matched up and they went to him and to his cohorts. The simple answer to your question is there was no tracing, so we're sitting here in the position of saying, well, we think this is what happened. But who has the burden to trace? It's the government, correct? Now, here's the problem. That was what they presented to the jury and what the jury found, that the money went to him. Right. The problem is that during these time frames and during this time frame, Global One was having a lot of problems with their Forex brokers because of the things that they were doing, trading against the trades and slippage and all this stuff. They weren't making the kind of money they thought they were going to make. And they had the additional problem with Concord Financial when the NFA shut them down and the members lost a whole bunch of money because of that, because they were undercapitalized. And what Young would do is he would send money from his Meili account back into the payout account to make integrity payments to these people to give them some money saying, hey, I'm a good guy, steer the course, here's money back for you because you lost and it's nobody's fault and we want to be good guys. That came out of the Meili account. Did this $202,000 go back for integrity payments? It might have. We don't know. But it's the government who brought this charge. It's the government who needs to do the tracing and prove it beyond a reasonable doubt or in that case disprove beyond a reasonable doubt that it didn't go that way. So ultimately, as I see it on that, we have to fall back on both Santos and Bush. If the payout account is there to pay legitimate third-party claims, and it most certainly was, and if that is a necessary part of the fraudulent scheme, which per the government it absolutely is, then it can't be. But the transaction in question was the transaction between the operational account and the payout account, right? All we know from the charging document is that my client caused $202,000 on that day to be wired into the payout account. That's what they had to prove. Okay, and it came from the operating account. I don't know where it came from. I would assume so. I would assume so. Yeah, I would assume it came from, yeah. How is that in any way central to the paying out? Why did you have to put it in that account? No reason. Because the third party, for this scheme to work, the members have to get paid some money. Right, but they would have to be paid from that account as opposed to the account money that it was originally in. They would get paid from the payout account. But they didn't have to be. Well, right, and as Agent Vita, that's actually how you pronounce it, said, there was a lot of confusion because sometimes the money didn't go the way it was supposed to go. You had a lot of flip-flopping back and forth. But, again, it's government's burden to trace. And if this is a, the way it's set up, that's a necessary part of the scheme. It can't be both wire fraud and money laundering. But you haven't explained why it was a necessary part of the scheme. I mean, in the other cases it was necessary to pay the people who, the transaction in question was the one that actually paid out to the people who needed to be paid. But that's not the transaction that we're looking at here. Well, I don't know how to answer your question other than to say, no, my understanding is that is exactly how they got paid. They got paid, the members got their winnings paid out out of the payout account. And this scheme, as you will, doesn't exist without the members getting paid. So, with less than five minutes, let me talk about the constructive amendment issue. And that's probably going to burn out my time. You don't want to save any time for rebuttal? I don't think I'm going to. All right, I'll tell you what. I'll submit the constructive amendment issue on the brief and save my time for rebuttal. Good. Okay. Good morning. May it please the Court, I'm Elizabeth White for the United States. Good morning, Counsel. First of all, to answer a question, just as I was sitting here at my desk, I looked through the government's closing argument, which is an excerpt of record from 435 to 500. That's the government's closing argument. And I did, admittedly, just scan through it briefly. There was a reference to Mr. Meckling on pages 440 and 441, and that's just with the government going through the various documents of the loans. There was no reference to the civil judgment that Mr. Meckling received on that. So, just to answer your question, I'll start with Judge Berzon's area of interest to the securities as a matter of law, the jury instruction. And, you know, this is interesting, and I understand why Judge Hicks came to the decision, you know, that he came to the conclusion, this was a sui sponte thing on his part, saying, I think that this is. Well, he was looking at the civil cases. Yeah, he was looking at civil cases, Supreme Court, this Court. There's a lot of language in those civil cases saying whether a document is a security as a matter of law, is a question of law. But that can't be right, can it? Boy, I mean, it doesn't seem right to me. I mean, I think that. Did the prosecutor object or ask the judge not to do that and let it go to the jury? I'll tell you, the first time when this came up at the first jury instruction conference, the judge said, oh, by the way, I've decided that I'm going to instruct the court that this is a security as a matter of law. And the prosecutor said, Your Honor, maybe I could do a little bit of research on that tonight, because I'm just, you know, not really sure. And he came back the next day and said, you know, I haven't found any cases that go your way on this. There's a Second Circuit case that seems to suggest that this should go to the jury. And, you know, and Judge Hicks said, no, I'm confident that this is a matter for the judge to decide, and at which point we said, well, okay, I mean, clearly the securities, the definition of securities includes profit-sharing agreements, you know, the statutory definition. You know, this court's definition of what an investment contract is, an investment of money in a common enterprise where the return is based on the, is anticipated return is based on the efforts of other securities. So, you know, so we didn't push it. I think we initially tried to kind of pause it, but then, you know, we did allow that once the judge said, nope, this is a question for me, we said, okay, fine. And maybe. So at least we're on the same page after all. Well, your brief wasn't. It would have been nice if you were a little more candid. So once we get there. Okay. So hard work. Yes, and clearly. I mean, and that's really what we fall down on. And I'll tell you, I mean, the way I hedged a little bit in the brief, I hadn't, I haven't gotten an answer from the solicitor general about making a concession. And so I sort of said, here's where I think the judge was coming from. But in any event, this is a question that is harmless beyond a reasonable doubt. The definition, I mean, what the court said in Nieder is that the failure to submit an element to the jury is harmless, where the evidence is, shows beyond a reasonable doubt that a properly instructed jury would have found the element. One would think you'd have to be really tough on that. Because when you're dealing, for example, here with something that's central and not peripheral. You're right. To the elements of the crime. It's not materiality or intent. I mean, I don't want to call this peripheral, but there's somewhat. But this is the crime. It is true. This is securities fraud. And the way this Court defined securities includes investment contract. This Court defined an investment contract as an investment of money in a common enterprise with an expectation of profits produced by the efforts of others. Well, but that would be true of a loan. I mean, just like that, I'm not sure why it excludes a loan. I think what we have here, and you look, I included a number of these agreements in the government's supplemental excerpt of record at 363 and forward. The document is entitled Loan Agreement, and it says, this allows the lender to participate in the profit-sharing program. You will receive profits based on how many trades our company does. They showed a chart, which I included in the excerpt of record right at the end, 371, I believe. The chart that they showed people saying a $500,000 contribution could pay off $20,000 a month forever if we have 4,000 lots traded per day. If the company does better and we're trading 10,000 lots per day, then you'll receive $50,000 a month forever. If we do even better, we do 20,000 lots a day, your $500,000 contribution, here it's called a contribution, will pay you $100,000 a month forever. Right? I mean, these people are being told, you invest this money, depending on how well we do, you can just sit back and reap the rewards. There is no question that this document is a security. There is simply no way that a properly instructed jury could have concluded anything else. Security doesn't have to have any ownership interest. No. So what's the defining element? Is that you're being paid for profits, you're being paid without regard to a principal amount, you're being paid? I think what the Supreme Court said in Reeves is that Congress intentionally defined securities very, very broadly. And their intention was to regulate investments. A mortgage is security? A mortgage is one of the things that is not, actually. A note secured, what the Supreme Court said in Reeves is that every note is presumed to be a security, but there are certain family resemblance tests that you go to to decide if it isn't. And the things that aren't are a note delivered in consumer financing, a note secured by a mortgage on a home, a short-term note secured by a lien on a small business, a character loan, notes evidencing a character loan to a bank customer. And so these are the examples that they give. There's this family resemblance test about whether something, whether a particular note is not a security. Every single one of these victims who contributed, in many cases their life savings, into this endeavor did so because they were told as the company grows, as it does better, your payouts are going to get bigger, everybody's going to get rich. Remember, you know, that Rick Young said to these people, wouldn't you have liked to be on the ground floor of Microsoft? You know, wouldn't you like to be one of those early investors just sitting back making piles and piles of money? This is your chance. You know, they were in the right place at the right time. Here's your chance to be at the right place at the right time. There's simply no way that a properly instructed jury could have concluded anything else. With respect to the money laundering, I think, first of all, Judge Berzon's observation, I think, was very good. There is nothing about this scheme to defraud that required Mr. Young or Global One to have multiple bank accounts and move money from bank account to bank account. You know, there's nothing. I think that in Van Alstyne, in Van Alstyne, there were a couple of different accounts, and the one that was the money that went to pay off the early investors. This Court said that is central. That was the payment to the investors. Right, exactly. Not the putting of the money into the account from which they would be paid. From which they would be paid. That the payment to the early investors was central because this was a Ponzi scheme and because by its nature it required those payments to early investors to get more investors and to beef up the investors. But what the Court said in Van Alstyne is the other payment, which was giving someone their entire investment back because they were complaining so much and the defendant was afraid they were going to call the authorities. That that was not central to the scheme. It actually undermined the scheme, but it helped keep the scheme going and, you know, promote it. But the Court in Van Alstyne affirmed on that count because that's not central to the scheme. Here what we have is Mr. Young, there was a web of bank accounts and they were moving money back and forth from bank account to bank account. There's nothing central to the scheme that required that. They could have had one bank account and paid everybody from that. With respect to the actual evidence of this particular money, though, we did trace this money and there was testimony about this money. This is at the government supplemental excerpt of record between about 372 and 376. This was on May 23, 2007. And on that date, $169,000 was transferred into the operating account. We have all the deposit slips. These were payments from victims. And we actually have the deposit slip where they wrote by hand each victim and how much their check was. $169,000 into the operating account. Same day, $202,000 transferred from the operating account to the payout account, $202,000. That's the count that was charged. And on the very same day, $205,000 was transferred from the payout account into Mr. Young's Mailey account. So we have, I mean, that was on that same day the money went. The victim's money was deposited, it was moved to a different account, and then it was moved into Mr. Young's personal account or the Mailey Corporation that he controlled. So clearly we would argue that the evidence was sufficient in terms of that. And because there's nothing about the scheme to defraud that required all of those various bank transfers, there was no requirement that the government prove that that involved profits rather than proceeds. With respect to the constructive amendment to the indictment, I'm trying to sort of wrap my head around this allegation. I think it boils down to a claim that because the government didn't use the word Ponzi scheme in the indictment, it was precluded from presenting evidence of the particular types of fraud that, you know, grouped together we commonly consider to be a Ponzi scheme. You know, this indictment alleged very specifically that Young devised a scheme to defraud to obtain money and property, to fraudulently induce investors into entering contract to loan money or invest in Global One, and specifically that they made false and fraudulent representations that the investors' returns would correspond to the number of trades placed in the forex. I mean, the Ponzi scheme evidence didn't really depend on there being no money at the end of it, but it depended on the fact that, in fact, the money was not coming out of profits. Was not coming from those broker rebates. I mean, I think that the idea of A proven falsity of what was promised. I'm sorry? I said there is proven falsity of what was specifically promised. Yes. And what happened, I mean, what was specifically promised was that these returns were based on the company's success in the forex market. And there were a number of victims who testified that when they got those early payouts, you know, they had invested a little bit of money in this profit sharing, and when they got these early payouts, that made them more confident in their investment. One of them specifically said, because why would there be profit sharing if there wasn't any profits? Clearly the company's doing well. Here, let me give you another $100,000. And this is what happened. I mean, many of these victims initially had invested $5,000 or $10,000, and then they started getting these payouts, and so then they cashed out their IRA. Or in the case of Mr. Meckling, he actually called them and said, I'd like to, you know, can you guys handle IRAs? I'd like to transfer my IRA to you. And they said, oh, yeah, sure, why not? So he sends them $350,000 or $400,000, and then it's gone. And then they won't return his phone call. So with respect to that, I mean, I think that the allegations and the proof of the fraud are precisely what was alleged in the indictment and the lack of using the word Ponzi scheme. There was one evidentiary ruling that caught my eye. Okay. He offered at some point in the trial, Mr. Young offered to present a demonstration. Oh, yes. Yes. And the offer of proof was such that the judge decided it was not for a variety of reasons, one of which was that he couldn't quite imagine how it would be recorded or captured in the record. Yes. Well, in fact, what he said was, you know, this was on the 10th day of trial that Young said, oh, by the way, I want to demonstrate this. And the government said, you know, A, this is the first we're hearing about this. We haven't had any opportunity to look at this, to have computer experts look at this, to get any idea of, you know. But the judge, and so in fact, at first the judge said, no, I'm not going to let it in. But then he mentioned it in cross-examination. He said, you know, I have this. Why can't I show it to you, you know. So the judge let him do this offer of proof. And so he comes in, and he does this offer of proof. And you can read it, you know, you can read it in the trial transcript. It's from 351 to 361. And it's, you know, it's 11 pages of now I'm doing this, and you see this, and now I'm going to close this out, and now the parameters. Here, let me change the parameters. C, it does it all automatically. And now I'm going to do this, and this, and this, and C, it's all automatic. And after 11 pages of this, Judge Hicks, you know, he said, he actually said, I cannot conceive of how the record could possibly reflect what we just saw here, but let me try to describe it. And what he said is, you know, this is one of our more experienced district court judges. He said, I've worked with juries for years, and I will tell you there is no way that they would see any probative value in this at all. But the biggest reason, it seemed to me, was because there was no way that this was tied back to the relevant time period. Absolutely. And, in fact, I mean, Mr. Young, when Judge Hicks first said, I'm going to let you do this offer of proof, but I'm just telling you right now that I'm not going to let it in unless you can prove to me that this is the program that existed in 2006, that you can trade on live accounts with it, and one or two other things. He made no attempt at the first. No, no. He specifically said, I mean, the first question his attorney asked him was, is this the global track that existed in 2006? He said, yes. Has it been modified? Well, yes, it's been modified. I've changed it. I've added the different parameters to make it better because we're constantly improving. And then he said, were there any other changes? No, no, no. We changed the parameters, but that's it. And then in the context of this demonstration, he starts talking about, you know, now I'm going to turn on the aggregator, and now you can see that the aggregating is working. And afterwards, when we made our objection to this, we said, you know, his entire testimony at trial was that they didn't have aggregating software because Global Edge and Francis Conlin ripped them off, and that was all their fault and not mine. And now he's saying this program has this aggregator software. So, you know, so there's another, I mean, there's just simply no way to tie this back to what may or may not have existed in 2006. There's another piece that was going on in this, you know, throughout the trial. The fundamental representation about global track that Young made in all of these webinars that the jury heard, I mean, we played the tapes of these webinars, was that this was essentially, you know, the robot computer that magically trades in the 4X and never loses, right? It has 97% winning rate, 99% winning rate, and it never loses. And you turn it on, and you go have lunch, and you come back, and you count your money. I mean, that was this. Throughout, about halfway through trial, they started talking about the global track differently, and they started talking, they started really focusing on this aggregation software. This was another piece of software that Global One was trying to buy from a company called Global Edge. And there was a lot of discussion about this. And as they were, you know, throughout, Mr. Young testified for a couple of days. And throughout this, he started sort of using the aggregation software and the global track software as if that was the same thing. And then he started talking about these expert advisors, which are these charting programs that you can get through various financial services. He started talking about these expert advisors or EAs as if that's what Global Track was. And I think, I mean, it's sort of, I think there were a couple of different computer programs that were being discussed, and he was really trying to kind of mix and match them. But there was specific testimony. I mean, Bill Willard, who was one of the co-conspirators, he testified that expert advisor and Global Track are two different things. That's not the same thing. Another witness testified that this aggregation software, this is not Global Track. That has nothing to do with what the Global Track is. The Global Track, you know, the magic robot computer, which Willard had sent out e-mails saying, hey, everybody, Global Track is up and running, and we're, you know, it's up 5% today, it's up 10% today. He testified, and this is at 270 in the excerpt of the record, there was no robot. I was the one who was making the trades, you know, when we were talking about this robot making trades. There was no robot. There were computer programmers who worked for years to try to build or, you know, to try to create a program that could trade in the Forex market automatically, and they failed. I mean, they said, you just, it can't be done. And, you know, maybe someday it could be done, but these guys couldn't do it, and Global One didn't have any, obviously, magic computer program. So. Okay. Unless the court has any other questions. Thank you. Thank you. Thank you for impliedly advising me to reserve my time, because I do want to talk about that issue. Which issue? The one you mentioned, Your Honor, about the demonstration. The pages, ER 133-34 describes the criminal scheme, and at its essence. How do you get by on the time problem, the problem that there's no way that this demonstration was. I'm sorry if you go like this. Yeah, I'm having a hard time hearing in this room. Anyway. The, oh, I don't know. Go ahead. Well, the basic question for the jury to decide was, based on the charges of the indictment, did Mr. Young and Global One have access to computers, to a computer software program that could track trends and automatically make trades, yes or no? And this was not the program that he, there was no tie-in between this program and the one that existed at the relevant time. I think what happened was he took the expert advisor and the metatraders, and he himself tweaked it to make something. Right. However you say it, it wasn't the same one. No. Why is that the end of it? It wasn't the same one. From the member's perspective, does it matter? I mean, I was thinking about this. It's like the guy walks into a bar and asks for a beer. Does it matter whether he gets Coors, Budweiser, or Miller? Sure. To some people. To some people, yeah. To the guy who just says, give me a beer. To the members, does it matter what we call this if it is software that is actually capable of doing what is being represented and results in winning trades majority of the time to make them income? Well, when, that's the question the judge was saying, assuming you have something that's wonderful and magical today in court, which wasn't shown, it was just another one of his little computer games, because it wasn't connected to anything, but assuming you have something wonderful and magical in court today, there's no indication that that's what you had then. Does that make a difference to people? Sure it does. If that's the record. As I interpret the record, it's different. The record is that what he was showing had the ability to spot trends and trade automatically in 06 and in 2011. The differences were on matters other than those, principally the ability to stop losses for the members so they wouldn't get hosed so badly. To me, on that record, it becomes not an admissibility issue but a weight issue. But if he cannot represent that this is a frozen in time version of what went on earlier, then whatever he's saying about what it is is simply spinach, because it doesn't matter what he's saying. He was not saying it's the same thing. I think he was. Go ahead. I'm sorry. I think he was saying it was the same thing in terms of ability to spot trends and trade automatically. That's my interpretation. It's like if somebody brings in a replica of a gun instead of the gun, right, and slightly amend it and wants to introduce it, slightly modify it and wants to introduce it as the murder weapon. You say, wait a minute, that's not the murder weapon. You can't introduce it. Right. Well, depending on what the fact issue is, if that replica discharges a bullet exactly as the real one did and that's the big issue, maybe it comes in and it's a matter of wait with a limiting instruction. And that's what we think this is, but it's relevant to the central issue. Now, let me just talk. Wait a minute, wait a minute, wait a minute, wait a minute. You're over your time limit. Okay. Okay. So we're going to submit the matter. Thank you. Thank you, counsel, very much. That ends our session for today. We'll be in recess until tomorrow. Thank you all very much.
judges: Fernandez, Paez, Berzon